UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BENNIE J. WALLACE,

                         **Plaintiff,**

  *- against -*

NANCY A. BERRYHILL, ACTING COMMISSIONER
OF SOCIAL SECURITY,[1]

                         **Defendant.**

14 CV 2066 (NSR)(LMS)

**REPORT AND
RECOMMENDATION**

**TO: THE HONORABLE NELSON S. ROMÁN, U.S.D.J.**

Plaintiff Bennie J. Wallace, proceeding pro se, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security (the "Commissioner"), which denied his claims for Supplemental Security Income ("SSI") benefits and Disability Insurance Benefits ("DIB") payments. ECF No. 2.[2] The Commissioner has filed a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. ECF No. 15. In opposition to that motion, Plaintiff submitted a two-page affirmation. ECF No. 18. For the reasons that follow, I conclude, and respectfully recommend that Your Honor should conclude, that the Commissioner's motion for judgment on the pleadings (ECF No. 15) be denied. As such, the ALJ's decision should be vacated, and the case should be remanded to the Agency for further proceedings consistent with this Report and Recommendation.

---

[1] Ms. Berryhill is the current Acting Commissioner of Social Security, effective January 20, 2017, and is automatically substituted herein as Defendant pursuant to Fed. R. Civ. P. 25(d).

[2] Citations to "ECF" refer to the electronic docket associated with this case.

# I.   BACKGROUND

## A.   Procedural History

Plaintiff filed claims for DIB (AR 137-40) and SSI (AR 141-44) on June 23, 2008.[3] In both applications, he alleged May 15, 2006, as the onset date of his disability. AR 137, 141. These claims were denied on October 3, 2008. AR 48-55. On November 14, 2008, Plaintiff requested a hearing before an administrative law judge ("ALJ") (AR 57), and on March 2, 2010, a hearing was held before ALJ David Pang. AR 9-27. Shortly thereafter, on March 11, 2010, ALJ Pang issued an unfavorable decision. AR 34-45. Plaintiff subsequently filed a request for review of that decision with the Social Security Administration's (the "SSA" or "Agency") Appeals Council, which was denied on October 27, 2010. AR 1-3. On December 21, 2010, Plaintiff brought a federal lawsuit in the United States District Court for the Southern District of New York. Wallace v. Comm'r of Soc. Sec., No. 10-Civ-9626 (PAC) (GWG). On June 6, 2011, the parties stipulated to remand the action to the Agency for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g). AR 422-23.[4]

On November 29, 2012, a second hearing was held before ALJ Hilton R. Miller. AR 393-420. On January 22, 2013, ALJ Miller issued a decision finding that Plaintiff was not disabled under the Social Security Act (the "Act"). AR 343-57. The Appeals Council once again denied Plaintiff's request for review, thereby making ALJ Miller's January 22 decision the operative, final

---

[3] Citations to "AR" refer to the certified copy of the administrative record filed by the Commissioner as part of her answer. See ECF No. 11.

[4] In an order dated August 9, 2012, the Appeals Council advised that, upon remand, the ALJ must inform Plaintiff of his right to representation, and ensure that "all evidence, including evidence submitted prior to the hearing, is evaluated" before a decision on Plaintiff's claims are made. AR 426-427.

action of the Commissioner. AR 310-13; see Lesterhuis v. Colvin, 805 F. 3d 83, 87 (2d Cir. 2015) (when "the Appeals Council denies review of a case, the ALJ's decision, and not the Appeals Council's, is the final agency decision." (citing Perez v. Chater, 77 F. 3d 41, 44 (2d Cir. 1996)). The instant lawsuit, seeking judicial review of that decision, followed. ECF No. 2.

### B.    Medical Evidence

#### 1.    Lincoln Medical and Mental Health Center

On August 27, 2007, Plaintiff first visited the Lincoln Medical and Mental Health Center ("Lincoln Medical") in the Bronx, New York. AR 458-59. He presented to Dr. Kirandeep Khangura complaining of left knee pain. AR 458. Plaintiff had been hit by a car about three months prior to the visit, and had been shot in his left knee in 1979. AR 458. He relayed to Dr. Khangura that he was a daily smoker and active cocaine user, and received treatment for substance abuse through the Albert Einstein College of Medicine. AR 458-59. A physical examination was unremarkable. AR 458. Dr. Khangura diagnosed pain in the left knee, and prescribed Tylenol Extra Strength. AR 458. Plaintiff was also referred to an orthopedic doctor and scheduled to undergo an X-ray of his left knee. AR 458. On the same date, August 27, Plaintiff was examined by Dr. Ruth Osowsky, who found that Plaintiff had no swelling or warmth in his left leg and "ambulate[d] well." AR 459.

On September 6, 2007, Dr. Hooma Zaidi reviewed an X-ray of Plaintiff's left knee. AR 464. Dr. Zaidi observed metallic screw remnants in the distal femur, as well as mild soft tissue swelling and periosteal reaction at the medial aspect of the distal femur. AR 464. There was no evidence of acute fracture or dislocation. AR 464. Two and one-half weeks later, on September

24, Dr. Harvey Sasken diagnosed Plaintiff with "pain in joint involving lower leg." AR 469.[5]

Plaintiff presented to Fernando Coleman, a physician assistant ("PA"), on November 1, 2007, complaining of chronic left knee pain. AR 472. A physical examination of the left knee revealed no effusion, joint line tenderness, or instability. AR 472. PA Coleman diagnosed "foreign body in [the left] distal femur," recommended physical therapy, and scheduled a follow-up appointment. AR 472.

On November 27, 2007, Plaintiff met with Dr. Mario Nelson, reporting that his left knee pain had worsened, causing him to awaken in his sleep and experience difficulty playing basketball. AR 475. Upon examination, Plaintiff demonstrated a full passive range of motion of the left knee. AR 475. He walked without an antalgic gait and did not require an assistive device. AR 475. Although Plaintiff possessed good muscle power in his left knee, Dr. Nelson noted some tenderness at the medial and anterior areas. AR 475. Dr. Nelson repeated Plaintiff's earlier diagnoses - foreign body in the left distal femur and pain in the left leg - before scheduling a follow-up appointment set to occur in one month. AR 475.

On December 5, 2007, Plaintiff met with physical therapist ("PT") Pilar Zamora. AR 479. Plaintiff described "on & off" pain in the left leg, which worsened upon ambulating. AR 480. Nevertheless, he walked without a gait or the need for an assistive device, his balance was unimpaired, and the muscle strength in his left knee was scored at a 4/5. AR 479. Plaintiff returned to PT Zamora on December 13, rating his pain at "3/10" and complaining of an "increased tingling sensation when [the] weather is cold." AR 481. During the course of a 45-minute physical therapy session, Plaintiff engaged in a series of exercises - he ran, pedaled on a stationary

---

[5] Other than blood test results, no further information, such as details regarding Plaintiff's left knee injury or mental health complaints, is mentioned in Dr. Sasken's notes. AR 468-70.

bicycle, and completed a quadriceps exercise - all of which he tolerated well. AR 481. Upon

examination, Plaintiff had no swelling in his left knee, and his muscle strength in that area was

rated as a 4+/5. AR 481. Once again, PT Zamora noted that Plaintiff neither suffered from

balance deviation nor an ambulatory gait. AR 481. On a December 19 visit to PT Zamora,

Plaintiff rated his pain at "2/10." AR 482. His left knee had, according to manual muscle testing,

improved to full strength, and the ranges of motion in both knees were within functional limits.

AR 482.

   Plaintiff returned to the office of Dr. Mario Nelson on January 15, 2008, where he

continued to walk without an antalgic gait or the aid of an assistive device. AR 484. With respect

to Plaintiff's left knee, the pain was scored at level "1," his passive range of motion was full, his

muscle power was normal, and his sensation to palpation was intact. AR 484. Dr. Nelson again

noted that Plaintiff suffered from a foreign body in the left distal femur. AR 484.

   On August 22, 2009, emergency medical services ("EMS") brought Plaintiff to Lincoln

Medical. AR 491. Plaintiff was examined by Dr. Mohammed Ahad, and registered nurses

("RN"s) Remedios Cabrera and Rose Clarke. AR 489-91. Plaintiff complained of knee pain, rated

at a level of 10/10, with RN Clarke indicating that "nothing help[ed] [to] relieve [Plaintiff's]

discomfort." AR 490-91. Plaintiff also described suffering from a history of anxiety and

depression. AR 490. He was treated and discharged on the same date with prescriptions for

Trazadone, Lexapro, Tramadol, and Naproxen. AR 490.[6]

---

   [6] Trazadone is an antidepressant. Drugs and Supplements: Trazodone (Oral Route), Mayo
Clinic,
http://www.mayoclinic.org/drugs-supplements/trazodone-oral-route/description/drg-20061280 (last
visited July 10, 2017). Lexapro is a selective serotonin reuptake inhibitor (SSRI). Diseases and
Conditions: Depression (major depressive disorder), Mayo Clinic,
http://www.mayoclinic.org/diseases-conditions/depression/in-depth/ssris/art-20044825 (last

Plaintiff returned to Lincoln Medical on February 23, 2010, complaining of chest pain. AR 495. An X-ray taken the same date, read by Dr. Keng-Gii Tai, indicated that there was no chest wall abnormality, both of Plaintiff's lungs were clear without evidence of infiltrate, consolidation, or effusion, and both frontal and lateral views showed normal heart size, and mediastinal and hila shadows. AR 494. RN Joseph Aburekhanlen noted that Plaintiff was in no acute respiratory distress, independent with daily activities, and walked without a gait. AR 496.

### 2. Federation Employment and Guidance Services

Plaintiff received treatment through Federation Employment and Guidance Services ("FEGS") between November 30 and December 10, 2007. AR 219-35. Angela Gray, a social worker, noted that Plaintiff had a history of cocaine dependence, but reported that he was undergoing treatment at the Albert Einstein College of Medicine, and had been substance free for four months. AR 223. Plaintiff scored an 11 on a PHQ-9 test, indicating moderate depressive symptoms. AR 224. He reported feelings of hopelessness, lethargy, difficulty concentrating, and low self-worth. AR 224. Plaintiff attributed these symptoms "to not using and having to deal with all of his problems." AR 226.

In addition to depression, Plaintiff reported suffering from chronic leg pain which could become so severe as to awake him from his sleep. AR 226. He indicated that he had stopped

---

visited July 10, 2017). It can be used to treat anxiety disorders as well. Id. Tramadol is used to relieve moderate to moderately severe pain. Drugs & Supplements: Tramadol (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/tramadol-oral-route/description/drg-20068050 (last visited July 10, 2017). Naproxen is used to relieve symptoms of arthritis, including inflammation, swelling, stiffness, and joint pain. Drugs and Supplements: Naproxen (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/naproxen-oral-route/description/drg-20069820 (last visited July 10, 2017).

taking his prescription pain medication "for fear of addiction." AR 226. With respect to performing activities of daily living, however, Plaintiff was generally independent and unimpaired, and he maintained contact with friends and family. AR 225.[7] Although Plaintiff did not suffer from visual hallucinations or suicidal ideations, Dr. Vijaya Reddi indicated that Plaintiff reported auditory hallucinations which told him to do "strange things." AR 228. Dr. Reddi diagnosed Plaintiff with depression, left leg pain, and a history of cocaine use. AR 232.

### 3. Albert Einstein College of Medicine

### 1. Dr. Vera Solovieva

Plaintiff began treatment at the Albert Einstein College of Medicine's Division of Substance Abuse ("Albert Einstein") in January of 2008. AR 255. When he first met with Dr. Vera Solovieva, on January 22, Plaintiff's chief complaints were depression and stress. AR 255. He also described suffering from poor concentration, memory, and impulse control, as well as anxiety, irritability, and "obsessive thoughts." AR 255. Plaintiff heard "on and off voices" which told him to sell drugs and hurt himself. AR 255. Beginning at the age of 13, Plaintiff had been a daily user of cocaine, usually consuming one gram per day; he relayed to Dr. Solovieva that he had been free from using illegal narcotics since September, 2007, but his most recent urinalysis, taken in October of that year, came back positive for cocaine. AR 255. Upon mental status examination, Plaintiff appeared mildly depressed, but his results were otherwise within normal limits. AR 256. Dr. Solovieva diagnosed cocaine dependence in remission; nicotine dependence; alcohol abuse; mood disorder not otherwise specified ("NOS"), as opposed to substance-induced

---

[7] Plaintiff reported that he spent his days caring for his daughter, who was then ten years old (AR 221), going to outpatient drug treatment and 12-step meetings, watching television, and playing pool. AR 225. He also indicated that he cooked, read, dressed and groomed himself, washed dishes and clothes, and swept the floor. AR 225.

mood disorder; and gave Plaintiff a global assessment of function ("GAF") score of 55, indicating

moderate functional impairments. AR 256.[8] She prescribed Zoloft, 50 mg,[9] scheduled a follow-up

appointment, and recommended group therapy. AR 256.

At his next appointment with Dr. Solovieva,[10] Plaintiff described persistent difficulties with

attention and concentration. AR 257. He had stopped taking Zoloft because it made him feel

"funny," but his results from a mental status examination were within normal limits. AR 257. Dr.

Solovieva wrote that Plaintiff's mood was euthymic rather than depressed. AR 257. She noted that

Plaintiff "stays clean and sober and proud of himself," before prescribing Seroquel, 50 mg,[11] and

recommending intensive outpatient treatment for substance dependence. AR 257. Her diagnoses

were unchanged. AR 257. On February 5, Dr. Solovieva wrote that Plaintiff's mood was unstable,

---

[8] A GAF score reflects a "clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") (4th ed. text rev. 2000) at 32. A GAF in the range of 41-50 corresponds to serious symptoms or any serious impairment in social, occupational, or school functioning; a GAF in the range of 51-60 corresponds to moderate symptoms or moderate difficulty in social, occupational, or school functioning; and a GAF in the range of 61-70 corresponds to some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning "pretty well," with some meaningful interpersonal relationships. Id. at 34.

[9] Zoloft is used to treat depression, obsessive-compulsive disorder (OCD), panic disorder, posttraumatic stress disorder (PTSD), and social anxiety disorder. Drugs & Supplements: Sertraline (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/sertraline-oral-route/description/drg-20065940 (last visited July 14, 2017).

[10] The two date fields corresponding to these notes are inconsistent; one lists the service date as January 29 while a separate field is dated February 26, 2008. AR 257. Either of these dates follow the alleged onset date and concern the relevant period, therefore the ambiguity as to the exact date of this appointment is immaterial for purposes of my analysis.

[11] Seroquel is used to treat depression, bipolar disorder, and schizophrenia. Drugs & Supplements: Quetiapine (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/quetiapine-oral-route/description/DRG-20066912 (last visited July 10, 2017).

"but better than before"; he was clean, sober, and liked his outpatient treatment program. AR 258. With respect to daily activities, other than attending treatment, Plaintiff played with his daughter and went to the library. AR 258. The results of a mental status examination were within normal limits. AR 258. Dr. Solovieva rendered the same diagnoses - cocaine dependence in early remission; nicotine dependence; alcohol abuse; mood disorder NOS, distinct from substance induced mood disorder. AR 258.

### 2.    Dr. Susan Whitley

On April 22, 2008, Plaintiff met with Dr. Susan Whitley of Albert Einstein for a psychiatric examination. AR 249, 259. Plaintiff complained of an episodic depressed mood, poor sleep, and excessive worry. AR 249, 259. He stated that he was not using illegal drugs and was regularly attending his treatment program, but had stopped taking Seroquel and requested that an alternative medication be prescribed. AR 249, 259. Dr. Whitley prescribed Trazadone, 100 mg. AR 249, 259. Plaintiff's performance during a mental status examination was generally normal, although Dr. Whitley noted that his anxiety appeared to prevent him from pursuing a return to work. AR 249, 259. Dr. Whitley diagnosed cocaine dependence, in early remission; nicotine dependence; alcohol abuse; and anxiety, NOS, rule out generalized anxiety disorder. AR 249, 259.

When Plaintiff returned to Dr. Whitley on May 13, he described experiencing some improvement from Trazadone, but had difficulty falling asleep. AR 252, 260. Dr. Whitley noted that Plaintiff had a "depressed mood at times." AR 252, 260. Plaintiff tended to worry excessively "about events out of his control, ... [such as] about taking care of [his daughter] if he gets a job: [quoting Plaintiff] 'What if the train breaks down and I can't pick her up from school on time [?]' " AR 252, 260. Results from Plaintiff's mental status examination were normal - Dr. Whitley found his mood and affect euthymic, his speech normal, and his thought process both logical and goal

directed. AR 252, 260. Plaintiff's diagnoses remained unchanged. AR 252, 260.

Plaintiff's next, and final, visit to Dr. Whitley occurred on July 8, 2008. AR 253, 261. Plaintiff denied sustained depression but continued to express symptoms of excessive worry. AR 253, 261. He remained drug free, however, and was preparing to graduate from an intensive outpatient treatment program. AR 253, 261. Plaintiff "felt calmer" on Lexapro, and Dr. Whitley noted that Trazadone "remain[ed] helpful." AR 253, 261. The results from a mental status examination, as with Dr. Whitley's diagnoses, are identical to the findings made at the prior visit. AR 253, 262.

### 3.     Dr. Alexandra Berger

Plaintiff first met with Dr. Alexandra Berger on August 21, 2008, complaining of increased anxiety with panic attacks. AR 250. A typical panic attack caused feelings of nervousness, paranoia, heart palpitations, shortness of breath, sweats, and shakes, but was short in duration and often relieved by taking a walk or "talking to someone." AR 250, 262. Plaintiff continued to attend outpatient treatment for substance abuse despite graduating from the program, and performed within normal limits on a mental status examination. AR 250, 262. He also stated that he felt "somewhat better," and more equipped to deal with stress, since his dosage of Lexapro had been increased. AR 251, 262. Dr. Berger added a prescription for Ambien,[12] 10 mg, as well, and diagnosed cocaine dependence in partial, sustained remission; nicotine dependence; alcohol abuse; panic attacks; and rule/out generalized anxiety disorder. AR 250-51, 262.

On October 30, 2008, Dr. Berger completed a psychiatric assessment form, in which she

---

[12] Ambien is the brand name for Zolpidem, which is used to treat insomnia. Drugs & Supplements: Zolpidem (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/zolpidem-oral-route/description/drg-20061195 (last visited July 10, 2017).

noted that Plaintiff suffered from occasional panic attacks, depression with increased irritability, excessive worrying, and poor sleep. AR 305. According to Dr. Berger, Plaintiff was easily distracted, but not delusional, and possessed fair judgment and insight. AR 305. She assigned Plaintiff a GAF score in the range of 55-60, and rendered the same diagnoses described above. AR 306. Dr. Berger opined that, while Plaintiff suffered from chronic symptoms, he could achieve remission with appropriate psychopharmacological intervention. AR 306. At the same time, she noted that Plaintiff lacked stable housing and appeared to be at high risk for relapse on substances. AR 306.

Also on October 30, Dr. Berger completed a form titled "Medical Assessment of Ability to Do Work-Related Activities (Mental)." AR 307. Dr. Berger indicated that Plaintiff's abilities were "Poor/None" in the following areas: following work rules; relating to co-workers; using judgment; interacting with supervisors; dealing with work stresses; and maintaining attention/concentration. AR 307-09. Dr. Berger based her opinion on Plaintiff's statements that he preferred to work alone due to difficulties getting along with coworkers and authorities, and that increased responsibilities exacerbated his anxiety and concentration problems. AR 308. Plaintiff's abilities in the following areas were considered "Fair" by Dr. Berger: dealing with the public; functioning independently; understanding, remembering, and carrying out complex job instructions; behaving in an emotionally stable manner; relating predictably in social situations; and reliability. AR 307-09. Dr. Berger found that Plaintiff's ability to understand, remember, and carry out detailed job instructions was "Good." AR 308. She considered Plaintiff's abilities to understand, remember, and carry out simple job instructions, and to maintain personal appearance were "Unlimited/Very Good." AR 308.

On January 30, 2012, Dr. Berger completed a "Report for Claim of Disability Due to

11

Mental Impairment" ("Report for Claim"). AR 504-11. She indicated that she began treating Plaintiff on August 21, 2008, and continued to meet with him once every two months through November 28, 2012. AR 504. Dr. Berger diagnosed Plaintiff with panic disorder, with agoraphobia, rule out generalized anxiety disorder and rule out ADHD; cocaine dependence, in full sustained remission; alcohol abuse, in full sustained remission; and avoidant personality traits. AR 504. Plaintiff was given a GAF score of 60, indicating moderate symptoms. AR 504. Dr. Berger wrote that Plaintiff's anxiety symptoms had "somewhat improved" over the course of treatment as a result of psychotropic medications. AR 506. Nevertheless, she opined, Plaintiff would have difficulty traveling by public transportation because his anxiety symptoms worsened around crowds of people. AR 506.

Also on the Report for Claim, Dr. Berger addressed the degree to which, in her opinion, Plaintiff was limited in various areas of functioning. She found that Plaintiff had slight limitations in activities of daily living; moderate difficulties in maintaining social functioning; slight and moderate difficulties in concentration, persistence, or pace; and suffered from repeated (three or more) episodes of deterioration in work or work-like settings. AR 507-08. In addition, Dr. Berger opined that Plaintiff was "markedly limited" in several areas of functioning, including: maintaining attention and concentration for extended periods; working in coordination or proximity to others without being distracted by them; completing a normal workday and workweek without interruptions from psychologically-based symptoms and performing at a consistent pace without unreasonable rest periods; interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; responding appropriately to changes in work settings; and setting realistic goals or making plans independently of others. AR 509-11. Plaintiff was "moderately limited" in his abilities to: understand, remember, and carry out detailed

instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; get along with peers without distracting them or exhibiting behavioral extremes; be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places or use public transportation. AR 509-11. Lastly, Dr. Berger indicated that Plaintiff was "not significantly limited" in each of the following areas of functioning: remembering locations and work-like procedures; understanding, remembering, and carrying out very short and simple instructions; making simple work-related decisions; asking simple questions or requesting assistance; and maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness. AR 509-11. Prompted to provide her comments on the above functional limitations, Dr. Berger noted that Plaintiff reported a history of difficulties getting along with supervisors and authorities. AR 511.

### 4. Dr. Sun J. Kim

Plaintiff first met with Dr. Sun Jin Kim, an orthopedist, on December 22, 2011. AR 517-18. Dr. Kim noted that Plaintiff had moderate left knee arthritis and attendant pain, which was not responsive to conservative treatment. AR 517-18. Plaintiff also demonstrated mechanical symptoms of locking and catching in the left knee. AR 517. On January 3, 2012, Plaintiff underwent a left knee arthroscopy . AR 515.[13] A physical examination of Plaintiff's left knee following surgery was normal, aside from mild effusion. AR 520. Dr. Kim concluded his notes writing, "At this time [Plaintiff] is doing well [,] we'll start him on therapy. See him back in 9

---

[13] Plaintiff was prescribed Percocet, and directed to use crutches and keep his leg elevated as much as possible. AR 515. Percocet is the brand name for oxycodone and acetaminophen; it is used to treat moderate to moderately severe pain. Drugs & Supplements: Oxycodone and Acetaminophen (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/oxycodone-and-acetaminophen-oral-route/description/drg-20074000 (last visited July 10, 2017).

weeks." AR 520.

On January 12, 2012, Dr. Kim completed a form titled "Physician's Report of Disability Due to Physical Impairment" ("Physician's Report"). AR 497-503. Dr. Kim indicated that he had treated Plaintiff on a monthly basis, from September 9, 2011, through January 3, 2012. AR 497. Dr. Kim opined that Plaintiff's knee arthritis would require him to lie down throughout the day. AR 499-500. Over the course of an eight-hour workday, Plaintiff would only be able to sit continuously for a total of two hours, and only occasionally lift up to five pounds. AR 499-500. Moreover, Dr. Kim noted, Plaintiff was incapable of carrying any weight, and could never bend, squat, crawl, or climb, but could continuously use his arms to reach. AR 501. The orthopedist then indicated that Plaintiff could never use either foot for repetitive movements, such as pushing and pulling of leg controls. AR 502. Additionally, Dr. Kim noted that Plaintiff had difficulty traveling by bus and subway, and should be totally precluded from working at unprotected heights, near moving machinery, or from operating a motor vehicle. AR 502.

On March 14, 2012, Dr. Kim diagnosed Plaintiff with severe osteoarthritis of the left knee, and injected the affected area with 4 cc of 1% lidocaine and 40 mg of Depo-Medrol, which produced immediate pain relief. AR 522.[14] Again, mild effusion of the left knee was noted. AR 522. Plaintiff returned to Dr. Kim on September 19, 2012, complaining of left knee pain, although, aside from the aforementioned effusion, results from a physical examination were

---

[14] Lidocaine injections numb the skin before certain painful procedures. Drugs & Supplements: Lidocaine (Intradermal Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/lidocaine-intradermal-route/description/drg-20137 337 (last visited July 10, 2017). Depo-Medrol injections work to relieve swelling, redness, itching, and allergic reactions. Drugs & Supplements: Methylprednisolone (Injection Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/methylprednisolone-injection-route/description/dr g-20075216 (last visited July 10, 2017).

normal. AR 523-24. Once again, Dr. Kim injected Plaintiff with pain medication which, treatment notes indicate, produced instant relief. AR 524. Nevertheless, and in seeming contradiction with his unremarkable findings, Dr. Kim stated that Plaintiff was "not completely responding to the injections" and his condition - severe osteoarthritis of the left knee - had not improved over the course of treatment. AR 524.

### 5. Dr. Dmitri Bougakov

On September 3, 2008, Plaintiff met with Dr. Dmitri Bougakov for a consultative psychiatric examination. AR 270. Plaintiff reported difficulty falling asleep, poor appetite, irritability, frequent worrying, discomfort being around others, forgetfulness, and jumpiness. AR 270. He indicated that he first began having these symptoms at a young age. AR 270. Results from a mental status examination were within normal limits. AR 271-72. Plaintiff was capable of engaging in many activities of daily living but felt uncomfortable riding on the train. AR 272. He reported having a good relationship with his family. AR 272. Generally, he spent his days staying at home, listening to the radio. AR 272.

Dr. Bougakov diagnosed Plaintiff with alcohol, cocaine, and cannabis abuse and associated anxiety and psychotic symptomatology. AR 273. The consultative psychologist opined that Plaintiff was capable of following and understanding simple directions and instructions, performing simple tasks independently, and maintaining attention and concentration. AR 272. Moreover, Dr. Bougakov found, Plaintiff could "possibly" maintain a regular schedule on a limited basis and was "somewhat limited" in his ability to learn new, and perform complex, tasks. AR 272. Dr. Bougakov also indicated that Plaintiff could make appropriate decisions, relate adequately with others, and deal with stress on a limited basis. AR 272. In concluding his medical source statement, the consultative psychologist indicated that the results of the examination

15

appeared to be "consistent with substance abuse problems [which] may significantly interfere with [Plaintiff]'s ability to function on a daily basis." AR 272. Dr. Bougakov rated Plaintiff's prognosis as guarded to fair, noting that he considered Plaintiff's symptoms relatively mild. AR 273.

### 6. Dr. Louis Tranese

Plaintiff met with Dr. Louis Tranese for a consultative orthopedic examination on September 3, 2008, presenting with lower back and neck pain. AR 274. Plaintiff did not arrive with any medical records. AR 274. He self-reported an intermittent, dull, "crampy," achy pain in his lower back which he experienced on a daily basis and rated at a severity level of 6/10. AR 274. According to Plaintiff, his lower back discomfort worsened upon sitting or standing for long periods, frequent bending, heavy lifting, and uncomfortable positioning, while his neck pain was exacerbated by repetitive head motions and sitting or standing for long periods. AR 274. Position changes, rest, and prescription anti-inflammatory medications alleviated Plaintiff's symptoms. AR 274. Dr. Tranese noted that Plaintiff could independently perform numerous activities of daily living, such as cooking, cleaning, laundry, and shopping, as tolerated. AR 275.

Dr. Tranese's physical examination revealed results which were generally unalarming. Plaintiff presented with a normal gait, and could walk on his heels and toes without difficulty, squat fully, and transition off and on the examination table without assistance or difficulty. AR 275. As to his cervical spine, Plaintiff demonstrated full flexion, extension, lateral flexion bilaterally, and rotary movements bilaterally; he showed mild, vague, generalized cervical paraspinal tenderness. AR 275. He also displayed full strength and range of motion with respect to his upper extremities. AR 276. Regarding his lower extremities, Plaintiff showed full range of motion of his hips, knees, and ankles bilaterally; full strength in his proximal and distal muscles bilaterally; and no muscle atrophy, sensory abnormality, joint effusion, inflammation, or instability.

16

AR 276.

Dr. Tranese diagnosed a history of a motor vehicle accident and chronic neck and lower back pain, rating Plaintiff's prognosis as fair to good. AR 276. In his medical source statement, Dr. Tranese noted that Plaintiff had moderate limitations with heavy lifting; mild to moderate limitations performing activities which required frequent squatting and forward bending; and mild limitations with sitting or standing for long periods, and walking for long distances. AR 276-77.

### 7. X-Ray Results

Plaintiff presented to Dr. Lawrence S. Liebman, a radiologist at IMA Disability Services in the Bronx, New York, for lumbosacral and cervical spine X-rays on September 5, 2008. AR 278-79. As to the lumbosacral spine, Dr. Liebman noted that the height of the vertebral bodies and intervertebral disc spaces were relatively well-maintained, and the pedicles were intact throughout. AR 278. According to Dr. Liebman, aside from a transitional L5 vertebral body, the results were otherwise unremarkable. AR 278. Dr. Liebman found Plaintiff had degenerative changes to his cervical spine, including spondylosis at C5-C6 and C6-C7, and lower cervical straightening. AR 279. There was no indication of a compression fracture. AR 279.

On August 9, 2010, Plaintiff received an X-ray of his left knee, the results of which were reviewed by Dr. Bruce Cohen on the same date. AR 513. Dr. Cohen observed a metallic density consistent with a bullet in Plaintiff's lateral left femoral condyle. AR 513. There appeared to be mild hypertrophic change at the medial femoral condyle as well. AR 513. Smaller densities, which, Dr. Cohen opined, may be related to smaller fragments and/or sclerotic changes in the bone, appeared adjacent to Plaintiff's left femoral condyle. AR 513. Dr. Cohen also noted a cluster of punctate denisties overlying the anterior lower thigh, as well as evidence of a large suprapatellar effusion. AR 513. There was no evidence of either an acute fracture, dislocation, or advanced

joint space narrowing. AR 513.[15]

## C.    Other Evidence

### 1.    Non-examining Agency Consultants

On September 11, 2008, M. Martin, an SSA disability examiner, completed a Physical Residual Functional Capacity Assessment form. AR 280-85.[16]  With respect to any exertional limitations, Martin found that Plaintiff was capable of occasionally lifting up to 20 pounds; frequently lifting and/or carrying up to 10 pounds; sitting, standing and/or walking (with normal breaks) for a total of approximately six hours in an eight-hour workday; and limited pushing and pulling with the upper extremities. AR 281. The disability examiner also opined that Plaintiff did not suffer from any postural limitations, such as kneeling or crouching, or manipulative limitations, such as feeling or reaching. AR 283.

On October 2, 2008, an SSA psychological consultant by the name of L. Meade completed two forms, a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment ("MRFC"). AR 287-303. On the Psychiatric Review Technique, Meade found mild limitations with respect to Plaintiff's capacity to perform activities of daily living and maintain

---

[15] On January 3, 2011, Dr. Roy Cohen of Albert Einstein wrote a letter, addressed "To Whom It May Concern," confirming that an X-ray showed a bullet fragment in the left knee and suprapatellar effusion. AR 514.

[16] Though an "examiner" by title, Martin based his conclusions on a review of the evidence in the file to date, rather than an in-person examination of Plaintiff. AR 280. Before rendering his findings, Martin summarized Plaintiff's medical history and the relevant medical evidence. Plaintiff, then aged 42, sustained a gunshot wound to the left knee in 1979, and was the victim of a motor vehicle accident approximately two years prior. AR 281. Since then, Plaintiff alleged chronic, intermittent neck and lower back pain. AR 281. Mr. Martin noted that physical examinations then in the record were "essentially negative except for mild vague generalized cervical paraspinal tenderness." AR 281. X-Rays of the thoracic, lumbar, and cervical spine were generally normal, except for cervical spondylosis from C5-C6, and C6-C7. AR 281.

social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of deterioration. AR 297. Meade, on the MRFC, concluded that Plaintiff retained the capacity to perform the basic mental demands of unskilled work in a low contact setting. AR 303.[17] The psychological consultant noted that Dr. Bougakov, in his consultative examination, found either normal mental functioning or mild intellectual limitations. AR 303. With respect to performing activities of daily living, Meade noted that Plaintiff maintained a good relationship with family members, traveled by public transportation, and managed his own money. AR 303.

2.    **Plaintiff's Application Materials**

Plaintiff completed a Disability Report on June 12, 2008, in which he alleged disabling depression, left leg pain, headaches, as well as back, hand, and sleeping problems. AR 173.[18]

---

[17] Turning to Meade's more specific findings on the MRFC, Plaintiff was "not significantly limited" in the following functional abilities: remembering locations and work-like procedures; understanding, remembering, and carrying out very short and simple instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and punctuality within customary tolerances; sustaining an ordinary routine without special supervision; making simple work-related decisions; interacting appropriately with the general public; asking simple questions or requesting assistance; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; remaining aware of normal hazards and taking appropriate precautions; and setting realistic goals or making plans independently of others. AR 301-02. The consultant also found "moderate limitations" in the functional areas of: understanding, remembering, and carrying out detailed instructions; working in coordination or proximity to others without being distracted by them; completing a normal workday and workweek without interruptions from psychologically-based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; responding appropriately to changes in the work setting; and traveling in unfamiliar places or using public transportation. AR 301-02.

[18] He also explained that he had difficulty remembering instructions, lacked motivation, lost the ability to focus on and follow instructions, heard voices and "saw things," felt sad and overwhelmed on a daily basis, experienced extreme mood swings and constant headaches with blurry vision, and found himself unable to remain in crowded places for long periods of time.

These conditions, according to Plaintiff, rendered him unable to work beginning on May 15, 2006. AR 173.[19] He reported chronic lower back pain which prevented him from lifting or carrying. AR 173. Intense pain in the spine, and related stiffness, precluded him from sitting or standing for long periods of time. AR 173. Plaintiff stated that his back pain rendered it difficult to concentrate and process information. AR 173. Because of his leg pain, he found it "very difficult" to walk long distances or climb stairs; he was also readily fatigued. AR 173. At the time, Plaintiff was prescribed Gabapentin, Lexapro, Naproxen, and Trazadone; he experienced no side effects, with the exception of drowsiness as a result of taking Gabapentin. AR 177.[20]

On July 14, 2008, Plaintiff submitted a Function Report. AR 181-89. In that report, he indicated that, between taking his daughter to and from school, he spent his days attending a drug treatment program. AR 183. Plaintiff describing having difficulty bending and standing on his feet for extended periods of time. AR 183. He reported being awoken in his sleep due to leg pain. AR 183. He also indicated that he had difficulty sleeping because, in part, he was "very paranoid." AR 183. Plaintiff wrote that he required reminders to attend his appointments, take his medications, and launder his clothes (AR 184), but could travel independently by public transportation. AR 185. He enjoyed reading, watching television, and taking his daughter to the

---

AR 173.

[19] In a Work History Report, dated July 14, 2008, Plaintiff detailed his occupational background and the functional demands at each of his previous jobs. AR 191-98. Plaintiff worked as a driver, from 1990 to 1993, then again from 1994 to 2001, and finally, from 2003 through 2006. AR 191. In between these stints, from 1993 to 1994, and 2001 and 2003, he held jobs as a cook at a nursing home and as a warehouse worker, respectively. AR 191.

[20] Gabapentin is used to help control partial seizures and is also prescribed to manage pain. Drugs and Supplements: Gabapentin (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/gabapentin-oral-route/description/DRG-20064011 (last visited July 10, 2017).

park, although he found reading difficult because he often forgot what he was reading, or his mind would "wander off" due to his "illness." AR 189. While he "could remember things that happene[ed] 20 years ago" he could not do the same with respect to "what happened yesterday." AR 189. Plaintiff also indicated that he could follow spoken, but not written, instructions. AR 188. In addition to these symptoms, Plaintiff described various functional limitations in areas such as lifting, squatting, hearing, and kneeling, due to back and leg pain. AR 187. He could walk for about two blocks before he had to stop and rest for approximately ten minutes, but could then continue. AR 188.

### 3.   November 29, 2012, Hearing

On November 29, 2012, Plaintiff appeared before ALJ Hilton Miller for an administrative hearing. AR 393. Plaintiff was represented by counsel, Andrei Ziabkin of the Legal Aid Society. AR 343, 435-36. Additionally, Peter A. Manzi, EdD, testified as a vocational expert. AR 343, 437-38.

#### a.   Plaintiff's Testimony

Plaintiff testified that he had completed the eleventh grade and was 46 years old at the time of the hearing. AR 397. He lived in an apartment with his daughter, who was then 15 years old. AR 411. Initially, Plaintiff stated that he had last worked as a barber "off the books" as recently as 2008. AR 402, 404. Prior to that, he worked as a truck driver and delivery person in 2006. AR 397.

Plaintiff testified that he was shot in his left leg in 1979, and was hit by a car in 2007. AR 403, 405. In the latter event, Plaintiff re-injured his left knee, and suffered abrasions to his face. AR 405. Although the bullet wound was sustained over thirty years prior, it had, according to Plaintiff, finally "caught up with" him so as to become a disabling condition in 2006. AR 399. As

21

a result, he could no longer run or bend. AR 399. He also testified that he had difficulty getting on the bus and climbing stairs, and that the related discomfort rendered it difficult for him to sleep. AR 399. He indicated that he did not receive relief from pain medications. AR 399.

Plaintiff also describing having knee surgery on his injured leg in January, 2012. AR 406. He testified that, since the surgery, he had been referred to a pain management doctor, where he received cortisone shots. AR 407. These injections, while they were successful in relieving Plaintiff's pain, were only effective for about two days at a time. AR 407. He testified that he planned to undergo a full knee replacement of the left knee later that year. AR 406. In addition, Plaintiff described experiencing lower back pain which began following the then-recent car accident. AR 408. This discomfort worsened upon bending. AR 408. Walking also proved difficult; when taking pain medication, the most Plaintiff could walk was for no more than two to three blocks. AR 409. He could sit for about an hour or two before his back pain began to bother him, at which time he would often need to get up, stretch, and walk. AR 409.

Plaintiff testified that he suffered from anxiety. AR 409. He described related symptoms of laziness, frustration, an inability to interact with others or take orders, and attitude problems. AR 409. Additionally, Plaintiff experienced short-term memory and concentration problems, and testified that he did not like to "be around anybody." AR 410. He spent his days "laying around," watching television, and playing games on his cellular telephone. AR 411. He had difficulty cooking meals that required lengthy preparation time, as he was unable to stand for long periods. AR 411. Additionally, he could not lift, sit in a car for extended durations, or move his legs to manipulate pedals or brakes. AR 412. Plaintiff testified that he was incapable of working in a job which would require him to remain seated because his pain medication caused drowsiness, and he would likely fall asleep. AR 412.

22

### b.      Vocational Expert's Testimony

Following Plaintiff's testimony, the ALJ questioned Peter Manzi, a vocational expert, who

opined on Plaintiff's prior work and the impact of his alleged disabilities on his ability to perform

other jobs. AR 415-19. Dr. Manzi first indicated that Plaintiff previously worked as a truck driver

(Department of Occupational Titles ["DOT"] number 905.663-014; limited to medium, semiskilled

work with an SVP[21] of 4) and driver (DOT number 913.663-018; limited to medium, semiskilled

work with an SVP of 3). AR 415. The ALJ then posed a series of hypothetical questions to the

vocational expert.

Turning to the first hypothetical, the ALJ asked Dr. Manzi to consider the work that could

be performed by an individual with Plaintiff's age (46), education (eleventh grade), and work

experience, who could occasionally lift and/or carry up to 20 pounds, and frequently do the same

with up to 10 pounds; occasionally climb ramps and stairs, but not ladders, ropes, or scaffolds;

occasionally engage in balancing, stooping, kneeling, crouching, and crawling;  stand and/or walk,

as well as sit, with normal breaks for a total of six hours in an eight-hour workday; but must avoid

concentrated exposure to temperature extremes and machinery; and, with respect to non-exertional

limitations, was limited to performing simple, routine, and repetitive tasks involving simple

decisions, with tolerance for occasional changes in routine and superficial contact with the public.

AR 416. Taking the foregoing into account, the vocational expert found that this hypothetical

---

[21] The Department of Labor's DOT defines "SVP" as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." U.S. Dep't of Labor, Dictionary of Occupational Titles, Appendix C (4th ed. 1991). Each SVP level corresponds to a time period; a level of three indicates a period of "[o]ver 1 month up to and including 3 months[,]" while an SVP of four corresponds to "over 3 months up to and indcluding 6 months[.]" See O*NET OnLine Help, https://www.onetonline.org/help/online/svp (last visited June 19, 2017).

individual could engage in at least three occupations existing in significant numbers in the national economy. AR 416-17. Dr. Manzi concluded that this individual could work as a photocopy machine operator (DOT number 207.685-014, limited to light, unskilled work with an SVP of 2), of which there were 33,855 jobs nationally, and 1,200 jobs in the New York region; a collator operator (DOT number 208.685-010, limited to light, unskilled work, with an SVP of 2), a job for which there were 44,148 jobs in the national economy, and 1,700 positions locally; and as a laundry sorter (DOT number 361.687-014, limited to light, unskilled work, with an SVP of 2), which had 129,000 positions nationwide and 1,200 in the local economy. AR 416-17.

The second hypothetical claimant possessed the same profile described above, but with the added limitation that he or she would be "off task 20 percent of the time." AR 417. Dr. Manzi responded that this individual would not be able to perform any job within the local or national economies. AR 417. Plaintiff's attorney at the hearing then posed one final hypothetical to the vocational expert, asking him to consider a putative claimant of Plaintiff's age and education, who was able to communicate in English, but who could only occasionally lift up to 5 pounds; and sit, stand, or walk for a total of two hours in an eight-hour workday, and, assuming the same non-exertional limitations described in the first hypothetical claimant, possessed the additional limitation of marked restrictions in maintaining attention and concentration for extended periods. AR 419. According to Dr. Manzi, there were no jobs existing in significant numbers in the national labor market which this last hypothetical claimant could perform. AR 420.

## II.  APPLICABLE LEGAL PRINCIPLES

### A.  Standard of Review

The scope of review in an appeal from a social security disability determination involves two levels of inquiry. First, the court must review the Commissioner's decision to determine

whether the Commissioner applied the correct legal standards. Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999). Failure to apply the correct legal standard is grounds for reversal of the ruling. Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984). Second, the court must decide whether the Commissioner's decision was supported by substantial evidence. Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. at 106 (internal quotation marks and citations omitted). When determining whether substantial evidence supports the Commissioner's decision, it is important that the court "carefully consider[] the whole record, examining evidence from both sides." Tejada, 167 F.3d at 774 (citing Quinones v. Chater, 117 F.3d 29, 33 (2d Cir. 1997)). "It is not the function of a reviewing court to decide de novo whether a claimant was disabled." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (citation omitted). As such, if the "decision rests on adequate findings supported by evidence having rational probative force, [the court] will not substitute [its own] judgment for that of the Commissioner." Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).

**B.** **Determining Disability**

The Act defines the term 'disability' as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). One is disabled under the Act if he or she suffers from an impairment which is "of such severity that he [or she] is not only unable to do his [or her] previous work but cannot ... engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). "[W]ork which exists in the national economy means work which exists in significant numbers either in the region where such

25

individual lives or in several regions of the country." Id.

Regulations issued pursuant to the Act set forth a five-step process to aid the Commissioner in determining whether a particular claimant is disabled. The Commissioner first considers whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i),(b), 416.920(a)(4)(i), (b). If the claimant is so engaged, then the Commissioner will find that the claimant is not disabled; if the opposite is true, then the Commissioner proceeds to the second step. 20 C.F.R. §§ 404.1520(a)(4)(i),(b), 416.920(a)(4)(i), (b). At step two, the Commissioner determines the medical severity of the claimant's impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). A severe impairment is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant suffers from any severe impairment, the Commissioner, now at step three, must decide if the impairment meets or equals a listed impairment; listed impairments are presumed severe enough to render one disabled, and the criteria for each listing is found in Appendix 1 to Part 404, Subpart P of the Social Security Regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii),(d), 416.920(a)(4)(iii),(d).

If the claimant's impairments do not satisfy the criteria of a listing at step three, the Commissioner must then determine the claimant's RFC. 20 C.F.R. §§ 404.1520(e), 416.920(e). A claimant's RFC represents "the most [he or she] can still do despite [his or her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). At the fourth step, the Commissioner determines whether the claimant can perform his or her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv),(e)-(f), 416.920(a)(4)(iv),(e)-(f). If the claimant cannot perform his or her past relevant work, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether he or she can make an adjustment to other work. 20 C.F.R. §§

404.1520(a)(4)(v),(g), 416.920(a)(4)(v),(g).

The claimant bears the burden of proof on the first four steps of this analysis. DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998) (citations omitted). If the ALJ concludes at an early step of the analysis that the claimant is not disabled, he or she need not proceed with the remaining steps. Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 2000). If the fifth step is necessary, the burden shifts to the Commissioner to show that the claimant is capable of other work. DeChirico, 134 F.3d at 1180 (citation omitted).

## III.   DISCUSSION

Presently before the undersigned is the Commissioner's motion for judgment on the pleadings, Plaintiff's affirmation in opposition to that motion, and the Commissioner's reply. Before turning to its merits, I will briefly address the procedural history surrounding the instant motion.

On September 22, 2014, the Commissioner timely filed the motion for judgment on the pleadings at issue. ECF No. 15. Pursuant to a modified briefing schedule, Plaintiff's papers were due on or before October 22. ECF No. 13.[22] On November 3, 2014, having received no cross-motion or other responsive papers from the pro se plaintiff, the undersigned ordered Plaintiff to serve and file his opposition to the Commissioner's motion, and his cross-motion for judgment on the pleadings, if any, no later than November 17, 2014. ECF No. 17. Plaintiff, on November 10,

---

[22] By letter dated July 11, 2014, the Commissioner sought an extension of the briefing schedule to account for the transfer of the case to a new attorney. ECF No. 8. On August 4, the undersigned granted that request, extending the time within which the Commissioner had to serve and file a motion for judgment on the pleadings, as well as the deadline for Plaintiff to serve and file his opposition to the motion, and his cross-motion for judgment on the pleadings, if necessary. ECF No. 13. Copies of the Order were mailed by the Clerk's Office for the United States District Court for the Southern District of New York to the pro se plaintiff of record on August 4, 2014. Id.

2014, submitted a two-page "Affirmation in Opposition to Motion," which does not contest nor respond to the Commissioner's legal arguments. ECF No. 18. The Second Circuit, however, "has denied that 'a plaintiff's failure to file a motion for judgment on the pleadings or to respond to the Commissioner's Rule 12(c) motion will result in the dismissal of his [or her] complaint.'" Orr v. Comm'r of Soc. Sec., No. 13-Civ-3967 (AJN), 2014 WL 4291829, at *4 (S.D.N.Y. Aug. 26, 2014) (quoting Nauss v. Barnhart, 155 Fed. App'x 539, 540 (2d Cir. 2005)). Rather, the court must interpret Plaintiff's affirmation liberally, looking to "the strongest arguments" that are suggested. Triestman v. Federal Bureau of Prisons, 470 F. 3d 471, 474 (2d Cir. 2006).

As such, in this case the issues are whether (1) the ALJ's analysis is free of legal error and (2) the factual findings made by the ALJ are supported by substantial evidence. For the reasons that follow, I find that the ALJ failed to develop the record and erroneously applied the treating source rule. These legal errors preclude the undersigned from determining whether the ALJ's decision is supported by substantial evidence. Accordingly, I conclude, and respectfully recommend that Your Honor should conclude, that the ALJ's decision be vacated and the case be remanded for further proceedings.

## A. The ALJ's Decision

On January 22, 2013, ALJ Miller issued his decision, finding that Plaintiff was not disabled within the meaning of the Act. AR 343.[23] Applying the sequential analysis set forth above, the ALJ first found that Plaintiff had not engaged in substantial gainful activity since May 15, 2006, the alleged onset date. AR 345. At step two, the ALJ found that Plaintiff suffered from the following severe impairments: status post left knee gunshot wound suffered in 1979, moderate left

---

[23] As a preliminary matter, the ALJ determined that Plaintiff met the insured status requirements of the Act through December 31, 2009. AR 343, 345.

knee arthritis, anxiety, and a history of substance abuse. AR 345-46. At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. AR 346.[24]

The ALJ then proceeded to determine Plaintiff's RFC. AR 346-50. The ALJ concluded that Plaintiff could perform light work, as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b), with certain limitations. AR 346-47.[25] Plaintiff could occasionally lift and carry 20 pounds, and frequently do the same with no more than 10 pounds; he could stand and/or walk, and sit, with normal breaks, for approximately six hours in an eight-hour workday; he had to avoid climbing of ladders, ropes, or scaffolds, and only occasionally climb ramps or stairs; he could occasionally balance, stoop, kneel, crouch, and crawl; but he had to avoid concentrated exposure to temperature extremes or work involving hazards such as machinery; and he was limited to simple, routine, and repetitive tasks, involving simple decision-making and only "superficial contact with the public." AR 346-47.

In determining Plaintiff's RFC, the ALJ first found that Plaintiff's statements regarding the

---

[24] Here, the ALJ considered listings 1.02 (major dysfunction of a joint), 12.04 (Affective disorders), and 12.09 (substance abuse disorders). AR 346. The ALJ did not provide an express explanation as to why Plaintiff neither met nor medically equaled listing 1.02. Turning to listings 12.04 and 12.09, the ALJ noted that Plaintiff had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation, each of extended duration. AR 346. The adjudicator supported this decision with evidence that Plaintiff could perform activities of daily living, "with and without the help of his daughter;" and the lack of objectively confirmed evidence of "debilitating social functioning issues, such as agoraphobia or panic attacks when exposed to crowds[,]" or of suicide attempts, manic or nervous breakdowns, or psychiatric hospitalizations. AR 346.

[25] Light work involves lifting up to 20 pounds at a time, and frequent lifting or carrying of objects weighing up to 10 pounds. Jobs at this exertional level typically involve "a good deal" of walking or standing, or "sitting most of the time with some pushing or pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b).

limiting effects of his impairments were not fully credible. AR 349-50; <u>see</u> 20 CFR §§ 404.1529, 416.929.[26] The ALJ then described the degrees of deference he assigned to the various medical sources. AR 350; <u>see</u> 20 CFR §§ 404.1527, 416.927. He gave the opinions of Plaintiff's treating psychiatrist, Dr. Berger, and treating orthopedist, Dr. Kim, "little weight." AR 350. To support doing so, the ALJ emphasized that, together, the treating sources' notes evinced "nothing but stable mental and physical findings since the beginning of both treatment relationships." AR 350. With respect to Dr. Berger the ALJ wrote that 2008 mental status examinations were "all normal," and that, while Dr. Berger stated that Plaintiff had "marked mental limitations," she also gave him a GAF score of 60, corresponding to moderate symptoms. AR 350. The ALJ noted that Dr. Kim found that Plaintiff's left knee was stable in 2012, and "attache[d] no objective findings confirming a sedentary residual functional capacity[.]" AR 350. The ALJ gave the state agency consultant's opinions "no significant weight." AR 350. The ALJ assigned "great weight" to both the physical consultative examiner, Dr. Tranese, and the psychological consultant, Dr. Bougakov. AR 350. The ALJ found that their opinions were consistent with Plaintiff's "essentially normal mental status examination and his mild to moderate physical limitations[.]" AR 350. Relying on mental status

---

[26] The ALJ discredited Plaintiff's testimony in part because it conflicted with the claimant's own activities of daily living. For example, the ALJ noted that Plaintiff, in a July, 2008, Function Report, indicated that he was primarily responsible for raising his daughter, read on a daily basis, and could use public transportation independently. AR 349. The ALJ also relied on the scores from PHQ-9 tests, which revealed only mild psychological symptoms, and mental status examinations, which were likewise unremarkable. AR 349. The ALJ also based his credibility determination upon the observation that Plaintiff's symptoms had improved over the course of psychological treatment. AR 349. Both Dr. Berger, Plaintiff's treating psychiatrist, and Dr. Bougakov, a consultative examiner, noted in 2008 that Plaintiff could perform simple tasks and follow simple instructions. AR 349. With respect to Plaintiff's physical symptoms, the ALJ noted that Plaintiff had full range of motion in the left knee as recently as September, 2012. AR 350. Moreover, the ALJ wrote that examinations of Plaintiff's left knee from 2008 through 2011 were largely normal, as were findings as to Plaintiff's gait. AR 350.

examinations from 2007 and 2008, the ALJ concluded by noting that "with physical therapy, medication compliance and regular psychotherapy the claimant's mental state stabilizes and he ceases to experience left leg pain." AR 350.

At step four, the ALJ determined that Plaintiff was unable to perform any past relevant work. AR 351. At the fifth step, the ALJ concluded that considering Plaintiff's age, education, work experience, and RFC, jobs existed in the national economy which he could perform. AR 351-52. Accordingly, the ALJ determined that Plaintiff was not disabled under the Act from May 15, 2006, the alleged onset date, through January 22, 2013, the date of his decision. AR 352.

**B.   Analysis of the ALJ's Decision**

      **1.   Legal Error**

            **a.   Duty to Develop the Record**

Whether the ALJ has fulfilled his or her duty to develop the record is a threshold issue. "Before determining whether the Commissioner's conclusions are supported by substantial evidence," the Court "must first be satisfied that the claimant has had a full hearing under the ... regulations and in accordance with the beneficent purposes of the [Social Security] Act." Moran v. Astrue, 569 F. 3d 108, 112 (2d Cir. 2009) (alterations in original) (quoting Cruz v. Sullivan, 912 F. 2d 8, 11 (2d Cir. 1990)). To ensure that the claimant has had a full and fair hearing, the ALJ has an affirmative duty to develop a "complete medical history for at least the 12 months preceding the month in which [the claimant] file[d] [his or her] application." 42 U.S.C. § 423(d)(5)(B); accord 20 C.F.R. §§ 404.1512(b), 416.912(b); see also Lamay v. Comm'r of Soc. Sec., 562 F. 3d 503, 508-09 (2d Cir. 2009). In the event that "there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." Rosa v. Callahan, 168 F. 3d

72, 79 n. 5 (2d Cir. 1999) (quoting Perez, 77 F. 3d at 48).

Here, the ALJ failed to fulfill his duty to develop the record when he acknowledged a clear gap in Plaintiff's psychiatric treatment records but made no efforts to remedy it.[27] Dr. Berger, Plaintiff's only long-term treating mental health professional, submitted two opinionative reports. The first document, a "Psychiatric Assessment" form with an accompanying MRFC, was completed on October 30, 2008. AR 305-09. The second report is dated January 30, 2012. AR 504-11. In that more recent report, Dr. Berger indicated that she had treated Plaintiff since August, 2008, and met with him once every two months through November 28, 2012. AR 504. The administrative record, however, contained "[as the ALJ recognized] only a handful of Dr. Berger's treatment notes ... and those notes are from 2008 only[.]" AR 348. Indeed the only notes from Dr. Berger which appear in the record are duplicate copies of those from her initial examination of Plaintiff in August, 2008. AR 250-51, 262. Assuming that similar documentation was generated each time Plaintiff met with Dr. Berger, then the ALJ was without notes which detailed at least 18 visits, spanning the course of more than three years. This constituted a clear gap in the record which merited further development by the ALJ. See, e.g., Velez v. Comm'r of Soc. Sec., No. 14-Civ-3084 (CS)(JCM), 2017 WL 1831103, at *15 (S.D.N.Y. May 5, 2017) (order adopting report and recommendation) (six-month gap in mental health treatment notes constituted gap in the record); Boswell v. Astrue, No. 09-Civ-533 (NAM), 2010 WL 3825622, at *4 (N.D.N.Y. Sept. 7, 2010) ("By failing to request treatment notes covering what appears to be two years of monthly

---

[27] It should be noted that the ALJ's duty to ensure that these records were complete was accentuated in this case, as Plaintiff alleged mental impairments. See Hidalgo v. Colvin, No. 12-Civ-9009 (LTS) (SN), 2014 WL 2884018, at *4 (S.D.N.Y. June 25, 2014) (explaining duty to develop the record is "particularly important where the applicant alleges he [or she] is suffering from a mental illness.").

visits, the ALJ failed in his duty to fully develop the record."); Longbardi v. Astrue, No. 07-Civ-5952 (LAP)(MHD), 2009 WL 50140, at *26 (S.D.N.Y. Jan. 7, 2009) (ALJ failed to develop "clear gap" in record when he did not attempt to seek bi-monthly treating source's progress notes, when nearly 12-months of notes were missing).

While the duty to develop the record does not demand that the ALJ embark upon a proverbial "fishing expedition," searching sua sponte for whatever records might bolster or hinder a particular claim, this Circuit has made plain that an ALJ cannot, as was done here, "reject a treating [source]'s diagnosis without first attempting to fill any clear gaps in the administrative record." Rosa, 168 F. 3d at 79. Although the ALJ mentioned the dearth of treating psychiatric notes in his decision, he failed to inquire into the missing notes at the hearing and did not appear to make any efforts to obtain them thereafter. In fact, the ALJ appeared to rely on the absence of treatment notes in assigning Dr. Berger's opinions little weight. AR 348, 350.[28] This constituted legal error, and augurs in favor of remand.

**b.    Weighing of Treating Source Opinions**

Under the Social Security Regulations, a treating source's opinion regarding the nature and severity of a claimant's impairments will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. §§ 404.1527(c)(2),

---

[28]An ALJ cannot, as a matter of law, deny a disability claim on such grounds without first attempting to complete the record. See Ulloa v. Colvin, No. 13-Civ-4518 (ER) (HBP), 2015 WL 110079, at *12 (S.D.N.Y. Jan. 7, 2015) (adopting report and recommendation); see also, e.g., Moran, 569 F. 3d at 114-15 ("We vacate [and remand] not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision."); Rosado v. Barnhart, 290 F. Supp. 2d 431, 440 (S.D.N.Y. 2003) ("The ALJ cannot rely on the absence of evidence, and is thus under an affirmative duty to fill any gaps in the record.") (emphasis in original).

416.927(c)(2); Diaz v. Shalala, 59 F.3d 307, 313 (2d Cir. 1995). Where, as in this case, an ALJ

assigns less than controlling weight to a treating source, the adjudicator must "always give good

reasons in [his or her] notice of determination or decision" for doing so. 20 C.F.R. §§

404.1527(c)(2), 416.927(c)(2). To aid in this weighing, the ALJ is required to consult various

factors, including the length of the treating relationship and the relevant specialty of the source,

if any. 20 C.F.R. §§ 404.1527(c)(2)(i)-(ii), (c)(3)-(c)(6), 416.927(c)(2)(i)-(ii),(c)(3)-(c)(6).[29]

The 'good reasons' requirement serves to prevent arbitrary decision-making, assist in judicial

review, and allow the claimant to "better understand the outcome of [his or her] cases." Oomen

v. Berryhill, No. 16-Civ-3556 (JLC), 2017 WL 1386355, at *11 (S.D.N.Y. Apr. 17, 2017) (citing

Halloran v. Barnhart, 362 F. 3d 28, 33 (2d Cir. 2004)). "Failure to provide 'good reasons' for not

crediting the opinion of a claimant's treating [source] is a ground for remand." Snell v. Apfel,

177 F.3d 128, 133 (2d Cir. 1999).

Here, the ALJ assigned "little weight" to the opinions of Drs. Berger and Kim, Plaintiff's

treating psychiatrist and orthopedist, respectively. The ALJ relied on three justifications for

assigning less than controlling weight to each treating source's opinions. These justifications,

however, do not comport with the requisite 'good reasons' required under the treating source rule.

As such, the ALJ should reevaluate the opinions of Drs. Berger and Kim upon remand.

Turning first to Dr. Berger, the ALJ cited three reasons for assigning the treating

psychiatrist little weight. The ALJ found that: (1) Dr. Berger's opinion that Plaintiff had marked

---

[29] The full list of regulatory factors are as follows: (i) the length of the treatment
relationship and the frequency of examination; (ii) the nature and extent of the treatment
relationship; (iii) the extent to which the medical source provides relevant evidence to support an
opinion; (iv) the extent to which the opinion is consistent with the record as a whole; (v) whether
the opinion is given by a specialist; and (vi) other factors which may be brought to the attention
of the ALJ. 20 C.F.R. §§ 404.1527(c)(2)(i)-(ii), (c)(3)-(c)(6), 416.927(c)(2)(i)-(ii),(c)(3)-(c)(6).

mental limitations conflicted with treating notes which showed that "the claimant has had nothing but stable mental ... findings since the beginning of [the] treating realtionship[;]" (2) Dr. Berger's 2008 mental status examinations were normal; and (3) Dr. Berger's 2012 report was internally inconsistent insofar as it noted marked mental limitations but assigned Plaintiff a GAF score of 60, which corresponds to moderate psychological limitations. AR 350. All but one of these justifications - the second - is problematic. First, the ALJ was without the vast majority of Dr. Berger's treatment notes.[30] He therefore could not have properly applied the treating source rule as a matter of law. See Pabon v. Barnhart, 273 F. Supp. 2d 506, 514 (S.D.N.Y. 2003) (until the ALJ develops the record, he or she "cannot even begin to discharge his [or her] duties ... under the treating physician rule.") (quoting Peed v. Sullivan, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991) (alteration in original)). The second justification offered, however-Plaintiff's normal mental status examination results, is a valid basis for discounting a treating source opinion. See, e.g., Pagan v. Colvin, No. 15-Civ-3117 (HBP), 2016 WL 5468331, at *13 (S.D.N.Y. Sept. 29, 2016) (normal mental status examinations constituted "good reason" for discounting treating source's opinion that claimant was disabled). With respect to the third rationale, to the extent that the ALJ found Dr. Berger's 2012 report internally inconsistent, he had an obligation to make reasonable efforts to resolve the conflict, such as by re-contacting the treating source for clarification, before dismissing the opinion. See Orr, 2014 WL 4291829, at *7 (reviewing cases and concluding that "The Second Circuit case law ... makes plain that an ALJ is not free to conclude that a treating [source]'s report lacks sufficient evidentiary support without first asking the [source] to provide

---

[30] Although the ALJ referred to notes "since the beginning" of the treating relationship, the only treatment notes that actually appear in the record are those from Plaintiff's initial visit with Dr. Berger, in 2008.

such support.").

Likewise, the grounds the ALJ relied upon in support of assigning Dr. Kim's opinions "little weight" were insufficient to satisfy the treating source rule. The ALJ's reasons for not granting the treating orthopedist's opinions controlling weight were as follows: (1) Dr. Kim's RFC finding conflicted with treatment notes which showed "nothing but stable" physical findings since the beginning of the treating relationship; (2) Dr. Kim noted that Plaintiff's left knee was "stable" following an arthroscopy in 2012; and (3) no objective findings were attached to Dr. Kim's 2012 report. AR 350. All three of these justifications are problematic. With respect to the first reason offered, although the ALJ described Dr. Kim's "nothing but stable" findings, he did not acknowledge that Dr. Kim, in the same notes, wrote that Plaintiff's left knee was "not responsive" to treatment. AR 517-18. Later treatment notes confirm that Plaintiff was "not completely responding" to pain management, including steroid injections. AR 524. Indeed, by March of 2012 Dr. Kim was of the opinion that Plaintiff's condition had not improved over the course of treatment. AR 524. Simultaneously, though, as the ALJ emphasized, the treating orthopedist indicated that Plaintiff was either "doing well" (AR 520) or had demonstrated "normal results" on physical examinations. AR 522, 524. As to the second reason offered, the ALJ accurately noted that Dr. Kim found that Plaintiff was stable following a left knee arthroscopy in January, 2012. Again, however, the ALJ made no mention of Dr. Kim's subsequent findings, those rendered in September of 2012, that Plaintiff was not responding to steroid injections, and recommending that Plaintiff undergo a total knee replacement. AR 524. Faced with these inconsistencies, the ALJ should have explained why he was adopting some of Dr. Kim's findings over others. Alternatively, he may have chosen to re-contact the treating orthopedist for clarification. Neither happened in Plaintiff's case. As a result, by simply citing to Dr. Kim's positive findings, while ignoring those

which were in conflict, the ALJ engaged in a selective review of the record. See, Gomez v. Comm'r of Soc. Sec., No. 15-Civ-00013 (BCM), 2017 WL 1194506, at *18 (S.D.N.Y. Mar. 30, 2017) (observing generally that "selectively quoting from the treating notes that reflect only a patient's 'good days'... undermines the treating physician rule and [constitutes] legal error."). The third rationale offered by the ALJ was the lack of clinical findings attached to Dr. Kim's opinions. However, rather than give the ALJ "license to assume" that Dr. Kim's opinions were incorrect, the lack of clinical findings attached therein "trigger[ed] a duty to seek" such evidence before rejecting Plaintiff's claim. Orr, 2014 WL 4291829, at *7 (emphasis in original); see Rivas v. Barnhart, No. 01 Civ. 3672 (RWS), 2005 WL 183139, at *23 (S.D.N.Y. Jan. 27, 2005) ("Moreover, where, as here, an ALJ concludes that the opinions or reports rendered by a claimant's treating physicians lack objective clinical findings, she [or he] may not reject the opinion as unsupported by objective medical evidence without taking affirmative steps to develop the record in this regard. In other words, an ALJ has an affirmative duty to seek amplification of an otherwise favorable treating physician report where the report is believed to be insufficiently explained or lacking in support."). The ALJ's failure to do so weighs in favor of remand.

Additionally, and apart from these justifications, the ALJ's weighing of the treating source opinions was silent with respect to the regulatory factors listed in 20 C.F.R. §§ 404.1527 and 416.927. See Selian v. Astrue, 708 F. 3d 409, 418 (2d Cir. 2013) (per curiam) ("[T]o override the opinion of the treating [source], we have held that the ALJ must explicitly consider, inter alia: (1) the frequen[c]y, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the [source] is a specialist."). A number of these factors were

relevant in evaluating the treating source opinions in Plaintiff's case, but absent from the ALJ's decision. For example, Dr. Kim specialized in orthopedic medicine, and Dr. Berger had a frequent and longstanding treating relationship with Plaintiff. As such, after having an opportunity to fully develop the record by requesting the missing treatment notes and seeking clarification from Drs. Berger and Kim, the ALJ should re-evaluate the treating source opinions to determine whether they are entitled to controlling weight. If they are not, and, if, as the ALJ did here, the ALJ adopts the opinions of consultative examiners over those of the treating sources, he or she should comprehensively lay out the reasoning for doing so. In undertaking this analysis, the ALJ should also consider the relevant regulatory factors more thoroughly.

### 2.    Substantial Evidence Review

The Commissioner argues that the ALJ's decision is supported by substantial evidence. However, because the ALJ has "failed to develop the record, the reviewing court 'need not - indeed, cannot - reach the question of whether the Commissioner's denial of benefits was based on substantial evidence.' " Oliveras ex rel. Gonzalez, 2008 WL 2262618, at *8 (quoting Jones, 66 F. Supp. 2d at 542), report and recommendation adopted, 2008 WL 2540816 (S.D.N.Y. Jun. 25, 2008); see also Pratts, 94 F. 3d at 38 (incomplete record precluded finding that decision was supported by substantial evidence). Where "there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that the claimant will be deprived of the right to have [his or] her disability determination made according to the correct legal principles." Johnson v. Bowen, 817 F. 2d 983, 986 (2d Cir. 1987). Here, as discussed above, the ALJ committed legal error in failing to develop the record, and misapplying the treating source rule. Accordingly, I cannot assess whether the ALJ's ultimate decision, as written, is supported by substantial evidence.

### 3.    Other Issues

As discussed above, remand is warranted because the ALJ did not abide by his duty to fully develop the record or the treating source rule. Nevertheless, remaining issues raised by the ALJ's decision will be addressed to the extent that such a discussion may narrow the scope of the Agency's reconsideration of this matter on remand.

### a.    Severe Impairments

At the second step of the sequential analysis, the ALJ must determine whether the claimant possesses a severe impairment. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). A severe impairment is defined as one which "significantly limit[s] [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1522(a), 416.922(a). Basic work activities include the abilities and aptitudes necessary to perform most jobs, such as, among others, walking, standing, sitting, seeing, hearing, speaking, understanding simple instructions, and using judgment. 20 C.F.R. §§ 404.1522(b), 416.922(b).

Here, the ALJ found that Plaintiff had four severe impairments. AR 345. Specifically, Plaintiff was status post a left knee gunshot wound, and had moderate left knee arthritis, anxiety, and a history of substance abuse. The ALJ also found that Plaintiff had non-severe spinal impairments. Because the ALJ found in Plaintiff's favor at step two, and the Commissioner does not dispute these findings, the undersigned finds no reason to disturb the ALJ's determinations. As such, on remand, there is no need to make new findings at the second step of the sequential analysis.

### b.    The Listings

At the third step in the sequential analysis the ALJ must determine whether the claimant has an impairment or combination of impairments that meet or medically equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "For a claimant to show that his [or her] impairment matches a listing, it must meet <u>all</u> of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990) (emphasis in original). An impairment which does not meet the specific criteria of a listing may nevertheless medically equal one; an impairment is medically equivalent to a listing if it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a). Here, the ALJ found that Plaintiff did not meet listings 1.02 (major dysfunction of a joint), 12.04 (Affective disorders), or 12.09 (substance abuse disorders).

In this case, substantial evidence supports the ALJ's finding that Plaintiff's impairments neither met nor medically equaled the severity of listing 1.02 (major dysfunction of a joint). Listing 1.02(A) is "[c]haracterized by gross anatomical deformity ... and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imagining of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)" coupled with the "involvement of one major peripheral weight-bearing joint [such as the knee], resulting in an inability to ambulate effectively." 20 C.F.R. Pt. 404, Subpart. P, App. 1, § 1.02. An inability to ambulate effectively for purposes of satisfying listing 1.02 is "defined generally as having insufficient lower extremity functioning ... to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b). Here, although the ALJ

did not expressly articulate how he arrived at the conclusion that listing 1.02(A) was not met, substantial evidence nevertheless supports the finding that Plaintiff did not meet the severity of the listing. See Berry v. Schweiker, 675 F. 2d 464, 468 (2d Cir. 1982) ("the absence of an express rationale does not prevent us from upholding the ALJ's determination regarding [the claimant]'s claimed listed impairments, since portions of the ALJ's decision and the evidence before him indicate that his conclusion was supported by substantial evidence."). Various medical sources corroborated that Plaintiff ambulated well, without a gait or the need for an assistive device, and possessed a full passive range of motion in the left knee. AR 275-76, 459, 475, 479, 482, 484. An X-ray of the left knee which was reviewed on September 6, 2007, showed no evidence of acute fracture or dislocation. AR 464. Similarly, a 2010 X-ray of the same knee revealed no acute fracture, dislocation, or advanced joint space narrowing. AR 513. This evidence establishes that there was no abnormal motion of the left knee and Plaintiff ambulated effectively. Moreover, medically acceptable imaging did not display joint space narrowing, bony destruction, or ankylosis of Plaintiff's left knee. Accordingly, substantial evidence supports the ALJ's finding with respect to listing 1.02(A).

The ALJ should, however, reevaluate on remand whether Plaintiff's mental impairments meet listings 12.04 and 12.09. In order to meet either listing,[31] a claimant must show that he or she meets the "paragraph B criteria" or the "paragraph C criteria." See Gomez, 2017 WL 1194506, at *11 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.04). Paragraph B requires at least two of the

---

[31] Although these regulations have been amended in the time since this action was filed, I have considered the regulations as they existed at the time the Commissioner's decision was issued. With respect to listing 12.09 (substance addiction disorders), the regulations state that, "The required level of severity for these disorders is met when the requirements in any of the following (A through I) are satisfied." 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.09. Included in the list of "A through I" are "B. Depressive syndrome. Evaluate under 12.04." Id.

following limitations: (1) marked restrictions of activities of daily living; or (2) marked difficulties in maintaining social functioning; or (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.04. Paragraph C is met when there is a medically documented history of a chronic affective disorder lasting at least two years which has "caused a more than minimal limitation in the ability to perform basic work activities," coupled with <u>one</u> of the following: (1) repeated episodes of decompensation, each of extended duration; or (2) a "residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate"; or (3) one or more years of an "inability to function outside a highly supportive living arrangement." 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.04(C). Here, the ALJ found that, with respect to the paragraph B criteria, Plaintiff had only mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation, each of extended duration. AR 346. In making this determination, the ALJ relied on Plaintiff's activities of daily living and the absence of "objectively confirmed and debilitating social functioning issues[.]" AR 346. As to the paragraph C criteria, the ALJ noted, without further explanation, that the evidence failed to demonstrate that Plaintiff met the relevant criteria. AR 346. While the ALJ applied the correct legal standard, he was without apparently two years worth of treatment notes from Dr. Berger. These notes, if obtained, would be reasonably likely to shed light on the degree to which Plaintiff suffered limitations in each of the four functional categories, if at all. Because remand is recommended for further development of

Plaintiff's psychiatric records, the ALJ should also reevaluate whether Plaintiff meets listings 12.04 and 12.09, upon seeking the missing psychiatric records from Dr. Berger and any additional clarification from the treating sources.

### c.     Credibility Determination

In determining whether a claimant is disabled, the ALJ necessarily takes the claimant's subjective reports of pain and other limitations into account. Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010). To aid in evaluating a claimant's credibility, the regulations set out a two-step process. First, the ALJ determines whether a claimant suffers from a "medically determinable impairment that could reasonably be expected to produce [his or her] symptoms." 20 C.F.R. §§ 404.1529(b), 416.929(b). If so, the ALJ considers "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record. 20 C.F.R. §§ 404.1529(a), 416.929(a).

In assessing a claimant's credibility, an ALJ must consider all available evidence, while providing "specific reasons for the weight accorded to the claimant's testimony." Alcantara v. Astrue, 667 F. Supp. 2d 262, 277-78 (S.D.N.Y. 2009) (citations omitted). In addition, the regulations direct the ALJ to consider information regarding (i) the claimant's daily activities; (ii) the location, duration, frequency, and intensity of his or her symptoms; (iii) any precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medications taken; (v) treatment other than medication used to relieve the claimant's symptoms; (vi) any measures used to relieve his or her symptoms; and (vii) other factors concerning functional limitations and restriction resulting from the claimed symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c).

43

Here, without a fully developed record, a reviewing court cannot conclude whether substantial evidence supported the ALJ's credibility finding. Merriman v. Comm'r of Soc. Sec., No. 14-Civ-3510 (PGG) (HBP), 2015 WL 5472934, at *23 (S.D.N.Y. Sept. 17, 2015) (order adopting report and recommendation). As such, upon attempting to secure the missing psychiatric treatment records, contacting Drs. Berger and Kim for clarification, and properly applying the treating source rule, the ALJ should also reassess Plaintiff's credibility. See Rosa, 168 F. 3d at 82 n. 7 (refusing to accept ALJ's conclusion as to the plaintiff's credibility given failure to develop the record); see also Garretto v. Colvin, No. 15-Civ-8734 (HBP), 2017 WL 1131906, at *22 (S.D.N.Y. Mar. 27, 2017) (concluding ALJ should re-evaluate the plaintiff's testimony after "taking steps to develop the record as directed."); Montilla v. Comm'r of Soc. Sec., No. 13-Civ-7012 (LTS) (MHD), 2015 WL 4460958, at *22 (S.D.N.Y. July 21, 2015) (although the ALJ "supported his credibility findings with sufficient detail and attention to the factors specified in the regulations and caselaw, it [was] nonetheless unacceptable because it [was] based on a record that [had] not been properly and fully developed.").

## CONCLUSION

For the foregoing reasons, I conclude, and respectfully recommend that Your Honor should conclude, that the Commissioner's motion for judgment on the pleadings (ECF No. 15) be denied. As such, the Commissioner's decision denying Plaintiff's claims for benefits should be vacated and the case remanded for further proceedings in accordance with this Report and Recommendation and pursuant to sentence four of 42 U.S.C. § 405(g).

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days, plus an additional three (3) days, pursuant to Fed. R. Civ. P. 6(d), or a

total of seventeen (17) days, see Fed. R. Civ. P. 6(a), from the date hereof, to file written objections to this Report and Recommendation. Such objections, if any, shall be filed with the Clerk of Court with extra copies delivered to the chambers of The Honorable Nelson S. Román at the United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at the United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered. Requests for extensions of time to file objections must be made to Judge Román.

A copy of this Report and Recommendation, as well as the unpublished decisions cited therein, have been mailed by Chambers to Plaintiff.

Dated: August 11, 2017
White Plains, New York

SO ORDERED

Lisa Margaret Smith
United States Magistrate Judge
Southern District of New York

45